FILED

2005 Sep-30  PM 05:26
U.S. DISTRICT COURT
N.D. OF ALABAMA



## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **THOMAS J. TOLBERT and WILLIE PETTY, individually and on behalf of others similarly situated; and UNITED STATES OF AMERICA,** | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| **LOUISE ALEXANDER, JASON DEAN, W. W. LEDBETTER, and HERMAN LEHMAN,** | ) ) ) ) | |
| Plaintiff-Intervenors, | ) | Civil Action Numbers |
| | ) | **2:83-cv-3050-UWC** |
| **vs.** | ) | **2:84-cv-0893-UWC** |
| | ) | |
| **CITY OF BESSEMER;** and **BESSEMER CITY COMMISSION;** *et al.,* | ) ) | |
| Defendants. | ) ) | |
| **CHARLES GIVIANPOUR and  J. WILSON DINSMORE,** | ) ) ) | |
| Defendant-Intervenors. | ) | |

## MEMORANDUM OPINION

_____These two consolidated actions were commenced against the City of

Bessemer Alabama and its governing officials over two decades ago by two of its

private citizens and the United States of America.  These consent decree Plaintiffs

alleged widespread violations by the Defendants of the Voting Rights Act of 1965,

42 U.S.C. § 1973, and the Fourteenth and Fifteenth Amendments to the United

States Constitution.  Over a period of years, and after substantial discovery, the

cases culminated in a 1985 Consent Decree.  Some fifteen years later, after the

racial composition of Bessemer's government had flip-flopped, the Alabama

legislature enacted a law (Alabama Act 2000-619) which de-annexed certain

property from the City of Bessemer.  This "sleeping giant" Consent Decree was

awakened; and the current phase of this litigation ensued.

Earlier on in the present phase, Plaintiff-Intervenors, who are current and/or

former members of the Bessemer City Council, filed a complaint in intervention

challenging the legality of Act 2000-619 ("Act 619").  This Court held that Act

619 was legally unenforceable because it had not received the required pre-

clearance from the United States Department of Justice ("DOJ"), pursuant  to

Section 5 of the Voting Rights Act.  42 U.S.C. § 1973c; (*see* Doc. 167, Order of

Feb. 15, 2002; Doc. 166, Mem. Op.).  Subsequently, Act 619 received the

necessary DOJ pre-clearance, thereby making the Act enforceable.

Plaintiff-Intervenors then filed an amended complaint, alleging that the

Alabama Legislature's enactment of Act 619 runs afoul of both Section 2 of the

Voting Rights Act of 1965, 42 U. S. C. § 1973, as well as the Fourteenth and Fifteenth Amendments to the United States Constitution.  *See* U. S. Const. amends. XIV & XV.[1]  Further, Plaintiff-Intervenors contend that the Alabama legislature's failure to enact a bill re-annexing said land to the City of Bessemer also offends the same provisions.

Based on the facts found and the reasons elucidated herein, the Court finds that Plaintiff-Intervenors have failed to carry their burden of proof on their claims. The awakened giant is now dead and due to be buried.

# I.  THE  RELEVANT  FACTS

## A. The Consent Decree and its Effects

Prior to the execution of the Consent Decree, the City of Bessemer ("City" or "Bessemer") was governed by a three-member Commission, elected at large. From its inception, all of the City's commissioners had been white.  Since at least 1950, a majority of Bessemer's residents have been blacks.  But black political participation in city government was virtually non-existent, though not from lack of effort.

---

[1]  In support of their arguments, Plaintiff-Intervenors also cite to several Alabama statutory requirements relating to annexations and de-annexations: Alabama Code Sections 11-42-200; 11-42-204; and 11-42-206.  These citations are inapposite because they place restrictions on annexations undertaken by municipalities, rather than the state legislature.

Between 1950 and 1984, city leaders actively recruited adjacent populated white areas for annexation, while denying the annexation petitions of surrounding black communities.

The Consent Decree changed all that.  The City's governing form went from commission to council.  Under the terms of the Consent Decree, the Bessemer City Council consists of one at-large member and six members elected from districts. Because Bessemer's housing patterns are racially segregated, representation of both races is assured on the City Council.

The Consent Decree requires that the City government "provide opportunities and inducements respecting annexation to persons equally without regard to race."  (Consent Decree, ¶ 18) (hereinafter "CD").  Specifically, the Consent Decree required that the City conduct annexation elections in surrounding areas described as "Parcels A, B, and C."  (CD, ¶¶ 11-20.)  As a result of one such election, Parcel A was subsequently annexed by the City.

Parcel A includes some of the most valuable real estate in Jefferson County. This parcel fronts on State Highway 150, adjacent to the City of Hoover - - one of Alabama's  fastest growing cities.

Under the express terms of the Consent Decree, this Court retains jurisdiction of these voting rights cases "to provide further relief or enter other

orders necessary for the effectuation of the terms of th[e] decree." (CD at  p. 15.)

In the years following the execution of the Consent Decree, black citizens of Bessemer, including named Plaintiff Thomas J. Tolbert, won elections to the Bessemer City Council.  By the early nineties, a majority of the city council persons and the Mayor of Bessemer were black.

## B. The Legislature's De-Annexation of the Parcel A Property

Since blacks gained control of the government of the City of Bessemer, the City de-annexed 300 acres of  Parcel A property owned by Vulcan Materials Company.  Defendant-Intervenor Charles Saed Givianpour ("Givianpour" or "Defendant"), a land developer, acquired this acreage and developed it as the upscale Cyrus Lake residential community.  In the early part of 2000, the Bessemer city government de-annexed an additional eleven acres of Parcel A property at Givianpour's request.

During the last half of the nineties, Givianpour purchased an additional 1000 acres of Parcel A property from United States Steel Corporation at a cost of $14 million.[2]  It was Givianpour's  purpose to develop an upscale residential housing complex on this acreage, with homes ranging from $180,000 to $500,000.

---

[2] Defendant-Intervenor J. Wilson Dinsmore ("Dinsmore") owns an additional 715 acres of the Parcel A property involved in this action.

Because of the inferior schools and lower property values in Bessemer, it was Givianpour's intention to have the property de-annexed from Bessemer, develop it, then have it annexed by the City of Hoover.

Bessemer City Council members communicated to Givianpour that they were unlikely to approve the de-annexation of the property. Given this information, Givianpour decided to by-pass the City. Assured of the support of Bessemer's first black Mayor, Quitman Mitchell, Givianpour paid highly-effective Montgomery lobbyist, Tom Coker, $25,000 to secure enactment of a state law de-annexing the Parcel A property.

The de-annexation bill was drafted as a local bill. After it was drafted, the bill was duly published in the *Alabama Messenger*. The cost of publication was paid for by the City of Bessemer. [3]

Coker requested that Senator E. B. McClain handle the bill in the Alabama State Senate. Senator McClain is the black state senator who represents the City of Bessemer, although he does not live within the City limits. Coker was aware that the bill could not pass over Senator McClain's objection.

Without checking with his counterpart, Priscilla Dunn, in the Alabama

---

[3] The *Alabama Messenger* is a newspaper devoted exclusively to the publication of legal notices. While available to the general public, it is not usually read by the public. At the time of the events at issue here, the Bessemer City Council did not subscribe to it; but apparently the Mayor's Office did.

House of Representatives, Senator McClain agreed to sponsor the bill. The Senator relied on Coker as a "straight shooter," who would have told McClain if the bill was going to be harmful to his district. Additionally, Bessemer Mayor Quitman Mitchell supported the de-annexation bill, and so informed Senator McClain. Unaware that the Bessemer City Council was opposed to de-annexation of the land, Senator McClain sponsored the bill, had it reported out of the Jefferson County Local Legislation Committee as an uncontested bill, and it passed the Senate without opposition or abstention.[4]

Coker did not approach black State Representative Priscilla Dunn, the only elected representative of the City of Bessemer in the Alabama House, to enlist her support of the bill. Instead, he convinced another black representative, John Hilliard, to sponsor the bill in the House. Representative Hilliard's legislative district lies wholly outside the City of Bessemer, in the City of Birmingham.

When Senator McClain's de-annexation bill was sent over to the House, it was referred to the Jefferson County Local Legislation Committee. Unaware of the Bessemer City Council's opposition to the bill, Senator Dunn nonetheless voted against it, as a matter of principle. She did not contest the bill in Committee or when it was referred by the Committee to the full House for a vote. She

---

[4] Had Senator McClain known of the Bessemer City Council's opposition to the bill, he would have killed it in the Senate.

assumed that Senator McClain's sponsorship of the bill meant that it had the

support of her constituents.  Hers was the only "nay" vote when the  bill  was

passed by the Alabama House of Representatives.

Ultimately, the de-annexation bill  was signed into law by then Governor,

Don Siegleman as Alabama Act 2000-619.

### C.  The Abortive Efforts to Repeal the De-annexation Law

After  citizens and  elected officials of Bessemer became aware of Act 619,

they reacted angrily and demanded that the law be repealed.  In response to this

outcry, both Representative Dunn and Senator McClain later introduced measures

to repeal Act 619.

Givianpour again hired Coker,  this time to defeat the re-annexation efforts.

Coker was confident he could do so because of political and racial considerations.

On three occasions, Representative Dunn was unable to get her repeal

measure voted out of the Local Legislation Committee. The nine white

representatives on the Committee, all  Republicans, voted against it.  Seven of the

black representatives, all Democrats, voted in favor of the repeal legislation.[5]

In the Alabama Senate, the repeal effort fared no better.  On the Local

---

[5] Notably, black Democratic Representative Hilliard abstained, without explanation. Black Representative Demetrius Newton also abstained, presumably because he has been involved in the present litigation.

Legislation Committee were four white Republican and three black Democratic senators.  Senator McClain was able to get his repeal bill out of Committee, apparently, with the vote of one of the white senators; but, when the bill came to the floor, the bill was contested and, thus, never came to a vote by the full Senate. Some of the Republican senators told Senator McClain that, in effect, they would kill has repeal bill.

There is no evidence that at any other time, the Alabama legislature has de-annexed property from a municipality over the objections of its elected governing body.  Likewise, other than McClain, Dunn, and Hilliard, there is no evidence that members of the Alabama legislature were aware that a majority of the Bessemer City Council members opposed the measure.

Realizing the futility of further legislative efforts to repeal Act 619, Plaintiff-Intervenors entered into the current phase of this litigation, challenging the legality of the Consent Decree.

## II. THE  APPLICABLE  LAW AND  ANALYSIS

### A. Claims Under the Voting Rights Act

Plaintiff-Intervenors ("Plaintiffs") first contend that the passage of Act 619 and the failure to repeal it violate Section 2 of the Voting Rights Act, 42 U.S.C. § 1973 ("VRA").  Section 2 prohibits any " voting qualification ... standard, practice

or procedure [which] results in a denial or abridgement of the right ... to vote on

account of race ...." 42 U.S.C. § 1973(a).  By the terms of the statute, a violation

> is established if ... it is shown that the political processes ... in the
> State or  political subdivision are not equally open to participation by
> members of a class of citizens  ... in that its members have less
> opportunity than other members of the electorate to participate in the
> political process and to elect representatives of their choice.

42 U.S.C. § 1973(b).[6]  "[T]wo distinct types of discriminatory practices and

procedures are covered under section 2 [of the VRA]: those that result in 'vote

denial' and those that result in 'vote dilution.'" *Burton v. City of Belle Glade*, 178

F.3d 1175, 1196 (11th Cir. 1999); *see* 42 U.S.C. § 1973.

---

[6]  In its entirety, Section 2 reads:

(a) No voting qualification or prerequisite to voting or standard, practice, or
procedure shall be imposed or applied by any State or political subdivision in a
manner which results in a denial or abridgement of the right of any citizen of the
United States to vote on account of race or color, or in contravention of the
guarantees set forth in section 1973b(f)(2) of this title, as provided in subsection
(b) of this section.

(b) A violation of subsection (a) of this section is established if, based on the
totality of circumstances, it is shown that the political processes leading to
nomination or election in the State or political subdivision are not equally open to
participation by members of a class of citizens protected by subsection (a) of this
section in that its members have less opportunity than other members of the
electorate to participate in the political process and to elect representatives of their
choice. The extent to which members of a protected class have been elected to
office in the State or political subdivision is one circumstance which may be
considered: *Provided,* That nothing in this section establishes a right to have
members of a protected class elected in numbers equal to their proportion in the
population.

42 U.S.C. § 1973.

1. Vote Dilution Claims

"[V]ote dilution occurs when an election practice results in the dilution of minority voting strength and, thus, impairs a minority's ability to elect the representative of his choice." *City of Belle Glade*, 178 F.3d at 1198. When analyzing a vote dilution claim, courts are to examine the "totality of circumstances," and determine whether the challenged conduct "results" in discrimination (i.e., to show dilution under Section 2, a VRA plaintiff is not required to establish discriminatory intent). *United States v. Morengo*, 731 F.2d 1546, 1563, 1565 - 66 (11th Cir. 1984). When applying the Section 2 "results test," typical relevant factors are:

1.   "the history of voting-related discrimination in the State or political subdivision";

2.   "the extent to which voting in the elections of the State or political subdivision is racially polarized";

3.   "the extent to which the State or political subdivision has used voting practices or procedures that tend to enhance the opportunity for discrimination against the minority group, such as unusually large election districts [and] majority vote requirements... ";

4.   "the  exclusion  of members of the minority group from candidate slating processes";

5.   "the extent to which minority group members bear the effects of past discrimination in areas such as education, employment and health, which hinder their ability to participate effectively in the political process";

6.      "the use of overt or subtle racial appeals in political campaigns "; and

7.      "the extent to which members of the minority group have been elected to public office in the jurisdiction."

*Thornburg v. Gingles*, 478 U.S. 30, 44 (1986) (citing S. Rep.  No. 97- 417, at 28-29 (1982), *reprinted in* 1982 U.S.C.C.A.N. 177, 206).  *See Gingles*, 478 U.S. at 35 (citing *Zimmer v. McKeithen*, 485 F.2d 1297 (5th Cir. 1973)).  Other factors which may be probative of a Section 2 violation are:

•      lack of responsiveness, on the part of elected officials, to the needs of minority group members; and

•      "whether  the policy underlying the state or political subdivision's use of  such  voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous."

*Gingles*, 478 U.S. at 45.

"While these enumerated [*Gingles*] factors will often be the most relevant [factors,] in some cases [ additional] factors will be indicative of the alleged dilution."  *Morengo*, 731 F.2d at 1566 n.32 (citation omitted).  Hence, the need to examine the "totality of circumstances."  *See id*. at 1565 - 66.

Plaintiffs argue that four of the *Gingles* factors weigh in favor of a Section 2 vote dilution violation in the present action:

1)      a history of racial discrimination in voting;

2)      past voting practices and procedures that tended to enhance the

opportunity for racial discrimination;

3)   evidence that blacks in Jefferson County, where Bessemer is located, bear the effects of past racial discrimination in areas such as education, employment and health, thereby hindering their ability to participate effectively in the political process; and

4)   significant lack of responsiveness on the part of elected officials.

The Court concludes that Plaintiffs here have established only two of the *Gingles* factors.  Indubitably, the State of Alabama and the City of Bessemer have a history of racial discrimination in voting, as well as a history of racially discriminatory voting practices and procedures.  However, in the wake of the political giant created by the Consent Decree, there is no evidence of post-1985 use of political devices by the City of Bessemer that tend to enhance the opportunity for racial discrimination in voting.  While the lingering effects of past and ongoing racial discrimination are reflected in the educational, employment, and health status of black citizens of Bessemer, not unlike blacks throughout the nation, there is no evidence that this sad fact has hindered the ability of black Bessemer citizens to effectively participate in Bessemer's political process.  Quite to the contrary, they control it  - by virtue of their election to a majority of the political offices in the City.  Significantly, the black Bessemer senator and representative in the Alabama Legislature, singularly and jointly, could have

defeated the de-annexation bill in the first instance.  Instead, Senator McClain sponsored the measure.

Similarly and clearly, Plaintiffs have not established a lack of responsiveness on the part of elected officials.  <u>Four of the seven members of the Bessemer City Council were black at the time Act 619 was passed!</u>  Once enactment of Act 619 was made public, both the Bessemer state senator and house representative immediately responded  to the outcry of these council-persons, and other citizens.  Thus, contrary to the argument made by Plaintiffs, the evidence actually shows significant responsiveness on the part of elected officials.

The *Gingles* factors simply do not establish vote dilution under Section 2.

Plaintiffs' reliance on *Hardy v. Wallace*, 603 F. Supp. 174 (N.D. Ala. 1985) is misplaced.  *Hardy* implicated Section 5 of  the VRA; there a three-judge panel found that the Alabama Legislature's enactment of local legislation, relating to appointment of the Green County Racing Commission ("Racing Commission"), was subject to pre-clearance under Section 5 of the VRA.  603 F. Supp. at 179. This Court has held that Act 619 could not be enforced unless, and until, it was pre-cleared.  The de-annexation legislation has now been pre-cleared.  *Hardy* is therefore inapposite. [7]

---

[7]Additionally, contrary to the argument made by Plaintiffs, the Section 5 pre-clearance standard cannot be applied in the present Section 2 action.  This is because the United States

In short, neither Act 619 nor the unavailing repeal efforts hindered the ability of black voters in Bessemer to "equally participate in the political process." *See Gingles*, 478 U.S. at 43 (citation omitted). Thus, applying the "results test," the Court concludes that the challenged legislative action, or inaction, did not result in dilution of the vote of black citizens. Plaintiffs have failed to establish their voting dilution claim.

## 2. Vote Denial Claims

"Vote denial occurs when a state, or a municipality, employs a 'standard practice, or procedure' that results in the denial of the right to vote on account of race." *City of Belle Glade*, 178 F.3d at 1197, 98 (citing 42 U.S.C. § 1973(a)). As with vote dilution claims, the *Gingles* factors apply to vote denial claims. *See City of Belle Glade*, 178 F.3d at 1197 - 98.

Accordingly, as concluded in the vote dilution section, Plaintiffs have failed to carry the burden of proof on their claims of vote denial.

---

Supreme Court has

> "consistently understood" § 2 to "combat different evils and, accordingly, to impose very different duties upon the States.... " [T]he § 2 inquiry differs in significant respects from a § 5 inquiry.... While some parts of the § 2 analysis may overlap with the § 5 inquiry, the two sections "differ in structure, purpose, and application ...."

*Georgia v. Ashcroft*, 539 U.S. 461, 477 - 78 (2003) (emphasis added) (citation omitted).

## B.  The Constitutional Claims

Plaintiffs next contend that the passage of Act 619 and the failure of its

repeal efforts constitute violations of the Fourteenth Amendment and Fifteenth

Amendment guarantees of the right to vote, as well as their Fourteenth

Amendment right to due process.

### 1. Vote Denial Claims

The Eleventh  Circuit  has  recognized  that  voting denial claims are

cognizable under both the Fourteenth and the  Fifteenth Amendments.  *United*

*States v. Morengo*, 731 F.2d 1546, 1554 (11th Cir. 1984).  As with VRA Section 2

claims, the central inquiry in a case alleging a denial of the constitutional

guaranties of the right to vote, without regard to race, is whether Plaintiffs were

denied an equal opportunity to participate in the political process.  The applicable

standard is different for constitutional cases than that in statutory cases.  While the

statutory analysis focuses on whether the challenged conduct "resulted" in a

voting denial, the constitutional analysis focuses on whether the challenged

actions were "conceived or operated as a purposeful device" to "minimize or

cancel out the voting potential of" blacks.  *See City of Mobile, Alabama v. Bolden*,

446 U.S. 55, 66 (1980).  Put another way, Plaintiffs must prove intentional

discrimination to prevail on their constitutional claims.  *See Washington v. Davis*,

46 U.S. 229 (1976).

Plaintiffs' constitutional claims are based substantially on the seminal case of *Gomillion v. Lightfoot*, 364 U.S. 339 (1960).  In *Gomillion*, the all-white Alabama legislature enacted a statute redefining the boundaries of the city limits of Tuskegee, Alabama.  Prior to enactment of the legislation, the city of Tuskegee was shaped in the form of a square.  However,

> the Act transformed the city boundaries into a strangely irregular twenty-eight sided figure ....  The essential inevitable effect of this redefinition of Tuskegee's boundaries [wa]s to remove from the city all save four or five of its 400 Negro voters while not removing a single white voter or resident.  The result of the Act [wa]s to deprive the Negro petitioners discriminatorily of benefits of residence in Tuskegee, including, inter alia, the right to vote in municipal elections.

*Id*. at 341.  Rejecting the "political question" doctrine, the Supreme Court held that the facts alleged by the Tuskegee plaintiffs were sufficient to state a cause of action under the Fourteenth and Fifteenth Amendments.  *Id*. at 342.

The *Gomillion* reed is woefully weak for Plaintiffs' position in the present case.  Here, the state actor who sponsored Act 619 is the same race as  Plaintiffs; and there is no showing that he was motivated by racial consideration.  Moreover, while Givianpour is not a state actor, there has been no showing of the requisite racial animus on his part.  This is simply not, as Plaintiffs contend, the "mirror image of the classic racially discriminatory municipal deannexation claim," where

the state legislature acts to disenfranchise black voters.  (*See* Doc. 232, Pl.-Intervenors' Prop. Findings of Fact and Concl. of Law, at p. 18.)

The Court cannot impute a racial motive to the white legislators who defeated the efforts to repeal Act 619.  After the Act became effective and the Parcel A property reverted to Jefferson County, other representatives and senators may well have had a legitimate, non-racial, motivation to preserve the property for future expansion/annexation by adjacent municipalities, such as the City of Hoover. [8]  With no direct evidence of racially discriminatory animus and, without more circumstantial evidence than the undeniable fact that white legislators defeated the repeal of Act 619,  Plaintiffs have not carried their burden of proof of intentional racial discrimination.  They have fallen far short of the mark in showing that the challenged legislative actions were "conceived or operated as a purposeful device" to "minimize or cancel out the voting potential of" blacks.  *See Bolden*, 446 U.S. at 66.

Indeed, Plaintiffs' failure to carry their burden of proof on the less stringent Section 2 "results test" foreshadowed failure on the substantially more difficult "intent test" applicable to their constitutional claims.  *See Lee County Branch of*

---

[8] Legislative consideration of the economic factors associated with annexations or de-annexations does not constitute evidence of discriminatory intent.  *See Burton v. City of Belle Glade*, 178 F.3d 1175, 1193 (11th Cir. 1999) (finding no evidence of discriminatory intent where a city decided against a proposed annexation after considering the economic impact of the proposal).

the *NAACP v. City of Opelika*, 148 F.2d 1473, 1479 n. 7 (11th Cir. 1984) ("[I] the
plaintiffs cannot prevail under the generally more easily proved 'results' standard
of section 2, it is unlikely that they could prevail on their constitutional claims
....")


## 2. Due Process Claim

Plaintiffs argue that publication of the proposed de-annexation bill in the
*Alabama Messenger* did not comport with the requirements of due process.
Specifically, Plaintiffs contend that the Due Process clause of the United States
Constitution was violated because publication in the *Alabama Messenger* was not
reasonably calculated to give actual notice to the citizens of Bessemer and the City
Council of Bessemer.

Plaintiffs rely on *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S.
306, 314, (1950), in which the United States Supreme "Court recognized that prior
to an action which will affect an interest in life, liberty, or property protected by
the Due Process Clause of the Fourteenth Amendment, a State must provide
'notice reasonably calculated, under all circumstances, to appraise interested
parties of the pendency of the action and afford them an opportunity to present
their objections.' " *Mennonite Bd. of Missions v. Adams*, 462 U.S. 791, 795
(1983) (emphasis added).  In addition to *Mullane*, Plaintiffs cite to numerous cases

where courts have invalidated legal proceedings and legislative actions after effected parties were notified via publication, rather than receiving actual notice.

This argument fails because Plaintiffs do not possess any constitutionally protected interest.  The persons or entities constitutionally entitled to notice in the cases cited by Plaintiffs held title or other possessory interests in the property - such as creditors, lien or mortgage holders, or general creditors.  *See Tulsa Prof'l Collection Servs., Inc. v. Pope,* 485 U.S. 478, 484 (1988) (creditor hospital, that was owed money for provision of medical services to deceased former patient, should have received actual notice of probate proceedings prior to losing ability to assert claim against the estate);  *Mennonite Bd. of Missions v. Adams*, 462 U.S. 791, 795 (1983) (holder of mortgage should have received actual notice prior to tax sale of the mortgaged  property); *Robinson v. Hanrahan*, 409 U.S. 38 (1972) (automobile owner who was incarcerated should have received actual notice mailed to the jail, rather than his home, prior to forfeiture sale of automobile); *State v. $17,636.00 in U.S. Currency*, 650 So. 2d 900 (Ala. 1994) (incarcerated owner of currency should have received actual notice mailed to the jail, rather than his last known residence, prior to forfeiture proceeding); *Walker v. City of Hutchinson,* 352 U.S. 112 (1956) (notice by publication to owner of property was

insufficient to appraise owner of condemnation proceedings). [9]

In contrast to the property interests or creditor interests asserted by parties in the cited cases, Plaintiffs here have no such interests. The present Plaintiffs are non-property owners and non-creditors. As such, for purposes of the Due Process clause, they are simply spectators.

*Opinion of the Justices*, 381 So. 2d 632, 634 - 35 (Ala. 1980), does not support Plaintiffs' due process claim. There, in advisory opinion, and in *dicta*,[10] the Alabama Supreme Court opined that the residents of annexed and annexing territories have a fundamental interest in the proposed annexation; therefore both are entitled to notice of proposed local annexation legislation under the Constitution of Alabama. The advisory opinion does not even mention federal rights of due process. Even if it had, its advice would hold no sway in federal courts - which are forbidden to issue advisory opinions. *See* Richard H. Fallon, Daniel J. Meltzer & David L Shapiro, Hart & Wechsler's The Federal Courts and

---

[9] Plaintiffs also cited to *Burris v. Sewer Improvement Dist.*, 743 F. Supp. 655 (E.D. Ark. 1990). As with Plaintiffs' other cited cases, *Burris* is not on point because it involved property owners who did not receive actual notice about a property tax assessment undertaken to pay for connection of sewer services. Not only is *Burris* not on point, but more importantly, the opinion in that case was vacated by the Eighth Circuit Court of Appeals, over ten years ago, for lack of jurisdiction: *Burris v. City of Little Rock,* 941 F.2d 717 (8th Cir. 1991).

[10] The precise issues on which the Alabama House of Representatives sought advice were whether House Bill 411 violated that provision of the Alabama Constitution: 1) which requires that each law shall contain only one subject, and 2) which requires that the publication of notice shall state the substance of the proposed law. *Opinion,* 381 So. 2d at 634.

the Federal System 93 - 98 (4th ed. 1996); Erwin Chemerinsky, Federal

Jurisdiction § 2.2 (4th ed. 2003).

The *Opinion* in no way provides legal authority for the proposition that the

"fundamental right" to receive proper notification of proposed legislation,

pursuant to the Alabama Constitution, is equivalent to the right to receive notice

under the Due Process Clause of the Fourteenth Amendment.

In sum, the Court concludes that Plaintiffs' have failed to carry their burden

of proof on their Fourteenth Amendment due process claim.


## III. CONCLUSION

The Consent Decree created a legacy for the black citizens of Bessemer.  It

was a giant which enabled them, for the very first time, to flex the political muscle

guaranteed them by the Voting Rights Act and the Fourteenth and Fifteenth

Amendments to the United States Constitution.  The Consent Decree authorized

annexation elections in contiguous areas.   As a result of these elections, valuable

realty - including, without limitation, Parcel A - became a part of the estate of the

citizens of Bessemer.  Black council members, a black Mayor, a black state

representative, and a black senator became the elected trustees of this estate.  If a

part of the estate assets, specifically Parcel  A, has been given away or exchanged

for the proverbial loaf of bread and bowl of soup, then Plaintiffs can only blame

their own elected trustees, separately and/or severally.

The evidence in this phase of these cases shows neither a violation of the Voting Rights Act nor the federal constitution.  Accordingly, this Court can grant no relief.


Done this 30th day of September, 2005.


_____
                U.W. Clemon
Chief United States District Judge